IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SYNCREON TECHNOLOGY (USA), LLC f/k/a NAL WORLDWIDE LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>CRST SPECIALIZED TRANSPORTATION, INC. f/k/a SPECIALIZED TRANSPORTATION, INC.,<br><br>    Defendants. | Case No. 15 C 7605<br><br>Judge Harry D. Leinenweber |

**MEMORANDUM OPINION AND ORDER**

**I.   BACKGROUND**

The facts of this case are simple: Plaintiff and Defendant are competitors in the supplying of specialized logistic services. Plaintiff subcontracted with Defendant to perform certain contractual work for one of Plaintiff's most important customers. As part of the subcontract, Defendant agreed not to solicit, directly or indirectly, any of Plaintiff's customers that were "introduce[d]" to Defendant as part of the subcontract work. However, during the term of the agreement, Defendant successfully solicited Plaintiff's biggest customer, and obtained the subcontracted work for itself. Plaintiff brought suit for violation of the agreement not to solicit. Defendant

defends, contending that it was acquainted with Plaintiff's customer prior to entering into the subcontract and, because Defendant was not introduced by Plaintiff to the customer, it was fair game for it to solicit the contractual work.

## II. **FACTS**

The Plaintiff and Defendant are specialized providers of integrated logistics services and customized supply-chain solutions to global industries. The general concept of these services is to relieve businesses, such as healthcare providers, telecom companies, and the like, from having to maintain, distribute, and keep track of inventories of materials used in their products.

In 2009, Plaintiff purchased NAL WorldWide LLC ("NAL"), which was also a specialized provider of integrated logistics services. Under the purchase agreement, Plaintiff assumed NAL's business operations and contracts, including its contracts with a customer named Ericsson, a Norwegian firm that was engaged in the telecommunications industry. In 2004, NAL entered into a Service Provider Agreement ("SPA") with Defendant's predecessor to provide logistic services to support NAL's work for Ericsson pursuant to a contract. As part of the agreement, Defendant, then under the name Specialized Transport, Inc., agreed to act

as a vendor for NAL (Plaintiff's predecessor) for various customers, including Ericsson. There is no disputing that Plaintiff and Defendant were at all relevant times the legal parties to the SPA and subject to its respective terms.

One of terms of the SPA is a non-solicitation agreement, which provides as follows:

> NON-SOLICITATION COVENANT. SERVICE PROVIDER covenants, warrants, represents and agrees it shall support and protect NAL's efforts under this Agreement by refraining from any direct or indirect solicitation of NAL's shippers and/or customers which NAL introduces to Service Provider during the term of this Agreement and for a period of (1) year immediately following termination of this Agreement, except by express written permission of NAL; provided, however, it is understood that SERVICE PROVIDER shall be permitted phone contact with such shippers and customers for operational purposes only. In the event SERVICE PROVIDER violates this provision, SERVICE PROVIDER agrees to pay NAL a fifteen percent (15%) commission on all revenue generated from such shippers and/or customers. SERVICE PROVIDER further agrees that NAL shall be entitled to appropriate injunctive relief for violation of this provision, including the enjoining of SERVICE PROVIDER from the solicitation of freight, transportation or storage from such shippers and/or customers.

(Dkt. 55-4 ¶ 16.)

In 2014, Defendant held meetings with Ericsson for the purpose of seeking to provide the same logistic services for Ericsson that it was performing on behalf of Plaintiff under the SPA. These meetings ultimately resulted in Defendant being

awarded most of Plaintiff's business with Ericsson and further resulted in Ericsson terminating its relationship with Plaintiff. As a consequence, Plaintiff has filed a seven count Amended Complaint against Defendant sounding in Breach of Contract (Count I); Tortious Interference with the Ericsson Service Agreement (Count II); Tortious Interference with Syncreon's Prospective Economic Advantage with Ericsson (Count III); Tortious Interference with Syncreon's Vendor Contracts (Count IV); Defamation Per Se (Misnumbered Count IV); Violation of the Illinois Uniform Deceptive Trade Practices Act-Commercial Disparagement (Misnumbered Count V); and Injunctive Relief (Misnumbered Count VI). Plaintiff moves for partial summary judgment on Count I, Breach of Contract. Defendant cross-moves for summary judgment on all of Plaintiff's counts.

### III. THE ISSUE

The issue in this case is rather simple: Whether Defendant's solicitation of Ericsson for the work that was performed under the contract between Plaintiff and Ericsson was a violation of the non-solicitation agreement contained in the SPA.

### IV. PLAINTIFF'S CASE

Plaintiff bases its case on its acquisition of NAL which included the Ericsson relationship and contracts. But for the subcontract work Defendant received from Plaintiff under the SPA, Defendant had no other relationship with Ericsson. Plaintiff further relies upon the testimony of David Puzzo ("Puzzo"), an Ericsson employee who handled the logistic business on Ericsson's behalf. Puzzo gave the following testimony:

> Q. Well, I guess my question is: Did you know if Ericsson had a business relationship with STI well before 2007?
>
> A. No. We never had a business relationship directly with STI. That's probably why I took that off of there, because when you say a business relationship, it means you have a contract. We never had a contract with STI.

(Puzzo Tr. 32:5-12, Dkt. 55.7.) Puzzo handled the logistic business for Ericsson for his entire tenure which predated STI's (CRST's) formation. This was corroborated by the testimony of Camille Hilton-Holle, one of Defendant's Rule 30(b)(6) witnesses. She testified as follows:

> Q. So after STI is formed, is STI then performing services for Ericsson through what eventually became NAL?
>
> A. Specifically Ericsson, yes.
>
> Q. And then NAL as we know was purchased by syncreon; correct?

>           A.   Yes.
>
>           Q.   And from that point forward all the services
>      provided to syncreon — or provided to Ericsson were
>      through either NAL or syncreon; correct?
>
>           A. Correct. . . .

(Hilton-Holle Tr. 22:14-24, Dkt. 55-12.) Further corroboration was supplied by Wes Struebing, another of Defendant's Rule 30(b)(6) witnesses. He testified as follows:

>           Q.   So what is the first direct contract that
>      you are aware of that STI gets with Ericsson after
>      STI's formation?
>
>           A.   The first direct contract signed with
>      Ericsson — I think the first direct contract was
>      signed as part and parcel of this 2014 bid.

(Struebing Tr. 125:5-10, Dkt. 55-11.)

Beginning in 2010, Defendant began holding "secret" meetings with Ericsson soliciting a contract to perform the logistic work it was performing for Ericsson under its SPA with Plaintiff. At these meetings, Defendant detailed its organizational structure and capabilities and reasons why Plaintiff should be awarded this business. In 2013, Ericsson had a change in leadership which led to a reconsideration of the outsourcing of the logistic services. Then, in 2014, Defendant held another "secret" meeting where Plaintiff was disparaged, Defendant's services were detailed, and Defendant and Ericsson

discussed how a transfer of Ericsson's business from Plaintiff to Defendant would "effect massive supply chain cost reductions." In 2014, Ericsson decided to rebid the logistic services. It then informed Plaintiff that it would be phased out of the provision of logistic services in March 2015, and the work would be transitioned to Defendant and others in June 2015.

### V. DEFENDANT'S DEFENSE

Defendant responds, arguing that because the term "introduce" is not defined in the SPA, the Court should use the dictionary definition, citing *Founders Insurance Co. v. Munoz*, 930 N.E.2d 999, 1005 (Ill. 2010). According to the dictionary, the plain meaning of the term "introduce" is "to lead to or make known by a formal act, announcement, or recommendation [*i.e.*] to cause to be acquainted." (Merriam-Webster.com, "introduce," *available at https://www.merriam- webster.com/dictionary/ introduce?utm_campaign=sd&utm_medium=serp&utm_source=jsonld*.) Defendants further argue that the absence of a contractual relationship between the Defendant and Ericsson prior to the SPA is "immaterial." If Plaintiff intended the SPA to account for all preexisting relationships, contractual or otherwise, Plaintiff should have made the non-solicitation provision applicable to all entities regardless of whether they had past

contractual relationships. Plaintiff did not do so. Defendant claims that while it did not have a contractual relationship with Ericsson prior to 2014, "it certainly had contact with Ericsson well before STI agreed to the non-solicitation." Puzzo testified that going back to 2004,

> [t]here were instances in which I highly suggested that STI provider be used for last mile transportation services for Ericsson's work due to STI's past experiences in specific experiences in specific market/city or due to STI's relationship with a customer.

Moreover, Scott Sovereign, Ericsson's Rule 30(b)(6) corporate representative, testified as follows:

> Q: Are you aware of whether NAL introduced STI to Ericsson?
>
> A: STI was a known provider in the industry to myself, to David Puzzo and others at Ericsson.
>
> Q: So you're not aware of whether STI was first introduced to Ericsson by NAL?
>
> A: [. . .] They are a known entity in the industry.

(Sovereign Tr. 60:24-62:3, Dkt. 55-22.) Further, Plaintiff's Rule 30(b)(6) representative testified that he had no knowledge of STI's relationship with Ericsson before the execution of the SPA.

## VI. DISCUSSION

### A. Count I – Breach of Contract

The issue therefore is simple. Did the fact that Defendant had never done work for Ericsson prior to performing under the subcontract with Plaintiff mean that the non-solicitation provision of the SPA prevented Defendant from obtaining work from Ericsson? Did the fact that Ericsson was aware of Defendant's existence and had contact Defendant's employees prior to the execution of the SPA mean that Defendant was not "introduced" to Ericsson by Plaintiff?

It appears to the Court that Defendant has the better of this argument. The non-solicitation provision in the SPA limits coverage to customers which Plaintiff "introduces" to Defendant. Plaintiff takes the position that Defendant's interpretation of the non-solicitation provision, because of the very limited membership of companies engaged in logistics specializing in the telecommunications industry, renders the provision worthless because it excludes all of Plaintiff's competitors from coverage. However, this result is caused by the clear language adopted by the drafter of the non-solicitation provision. Here the parties, for reasons that are not apparent, did not deem it necessary to define "introduce" so as to give it an idiosyncratic meaning, thus leaving it to the ordinary (or dictionary) meaning of the term, which is "to cause to be

acquainted." Defendant obtained this definition from *Merriam-Webster.com* and Plaintiff does not dispute it. In turn, "acquainted" means "familiar, conversant, accustomed, aware." (Merriam-Webster.com, "acquainted," *available at https://www.merriam- webster.com/dictionary/ acquainted?utm_campaign= sd&utm_medium=serp&utm_source=jsonld.)* Plaintiff argues that it introduced Defendant to Ericsson because Defendant did not have a previous contractual relationship with it. However, this appears to expand significantly the concept of "introduce" well beyond "acquainted," "familiar," "conversant," etc. Certainly Plaintiff must have been aware of the danger of subcontracting work to an entity that is able to perform the same work that Plaintiff contracted to do. One would be aware that the contracting customer might conclude that the work could be performed cheaper if the middleman (in this case Syncreon) were cut out of the picture. The easiest way to protect against soliciting the subcontracted work would be to adopt some verifiable objective fact such as previous contracting. As Plaintiff itself admits, it could not readily have known whether Defendant was acquainted with Ericsson at the time the SPA was adopted, considering the fact that this type of logistics is a

niche industry where presumably each participant is acquainted with the others. This was the case with Ericsson, whose knowledge of Defendant's existence was testified to by David Puzzo, as quoted above. Plaintiff itself proved that it can write a non-solicitation agreement that would have prevented Defendant from taking the Ericsson work. It did so in 2013 when it redrafted its SPA.

Plaintiff cited *Broadmark Capital v. Globalnet, Inc.*, 169 F. Supp. 2d 873 (N.D. Ill. 2001) in support of its position. However, this case stands for the uncontroversial proposition that courts interpret contractual provisions as written rather than "insert[ing] any judicial crafted" additional requirement. *Id.* at 877. The plaintiff in *Broadmark* entered into a contract to obtain equity financing for the defendant. *Id.* at 876. The defendant agreed to provide a commission if it obtained financing from an entity introduced to it by plaintiff. *Id.* The agreement defined the concept of "introduction" in this way:

> For the purposes of this Agreement a party shall be considered to have been "introduced to the Company through Broadmark" if such a party was introduced to the Company by Broadmark, its agents or employees, or if the Transaction between the Company and such party arose from or was made possible by Broadmark, its agents or employees.

*Id.* The plaintiff introduced a possible financing source to the defendant, but the effort initially fell through. Later, someone else brought the same source back to the defendant, and financing was then consummated. The plaintiff demanded a commission, but the defendant refused because the plaintiff had not demonstrated that at the time the plaintiff introduced the source to the defendant, the source was "ready, able and willing" to go forward. *Id.* at 877. Thus, the plaintiff was not the procuring cause of the financing. Judge Milton I. Shadur of this district granted the plaintiff's motion for judgment on the pleadings, affirming that nowhere in the agreement was there a requirement that the introduced financing source be "ready, able and willing" at the time of the introduction. *Id.* at 880. The court concluded that by urging the provision be read to require the entity earning the fee to be the procuring cause, the defendant was "guilty of seeking to engraft language that just does not appear." *Id.* at 879.

Both parties here agree that the contractual provision in question is not ambiguous. The fact the parties disagree on its meaning does not make it ambiguous. Whether it is ambiguous is a question of law for the court. *Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 214 (Ill. 2004). It is also

undisputed that Plaintiff was the scrivener of the provision in question. As the Seventh Circuit reasoned, where contract language is clear, the courts should look no further than the contract language:

> The security that contracting parties seek when they commit their deal to writing requires a presumption that a written contract is to be interpreted without bringing in a jury to decide whose oral testimony about what the parties *really* intended is more credible. Only if a judge is stumped after making his best interpretive efforts and only if the oral or other "extrinsic" evidence that would be offered at trial would be likely to disambiguate the contract does the court convene a trial.

*McElroy v. B.F. Goodrich Co.*, 73 F.3d 722 (7th Cir. 1996) (emphasis in original) (citation omitted). In this case, the Court, using its best interpretive efforts, believes that the SPA's non-solicitation provision does not prevent the Defendant from entering into a contract with Ericsson which replaces Plaintiff with itself. Accordingly, the Plaintiff's Motion for Summary Judgment on Count I of the Amended Complaint is denied, and the Defendant's Motion for Summary Judgment on Count I is granted.

### B. Defendant's Motion for Summary Judgment on Remaining Counts

Defendant also moves for summary judgment on the remaining counts. First, the Tortious Interference Claim is based on

Defendant's alleged interference with Plaintiff's contract with Ericsson.  However, the evidence demonstrates that Ericsson did not breach its contract with Plaintiff.  It merely refused to renew it.  Thus there is no basis for interference with the contract.  Plaintiff also claims that Defendant tortuously interfered with prospective economic advantage with Ericsson.  However, the unrebutted evidence presented in the testimony of Ericsson's Rule 30(b)(6) witness, Scott Sovereign, showed that Ericsson had a change in control that resulted in a reconsideration of the outsourcing of the logistic work performed under Plaintiff's contract with Ericsson.  Sovereign further categorically denied that Defendant did anything to induce a change in the logistic work.  Plaintiff was unable to counter this testimony.  Therefore, the Court grants Defendant's Motion for Summary Judgment on both of the tortious interference claims.

Plaintiff also claims that Defendant induced its other vendors who had non-compete contracts with it to violate them by accepting the work that they were performing for Plaintiff.  However, Plaintiff's Rule 30(b)(6) witness was unable to name a single vendor who was violating its contract with Plaintiff.  Nor was that witness able to state whether any particular vendor

was doing work for Ericsson or for Defendant. Therefore, the Motion for Summary Judgment on this claim is granted.

The Plaintiff's last counts are for defamation per se and for violation of the Illinois Uniform Deceptive Practices Act, 815 ILCS 510/2(a)(8), both of which rely upon the same evidence. The facts relied upon by Plaintiff include the following communications with Ericsson: Syncreon's service levels were "unacceptable" and that Syncreon "lost all link to transportation roots" and "never had transportation operations team" and "the best and brightest stayed at STI/CRST and left NAL now Syncreon." According to Plaintiff, these statements constitute defamation per se because they constitute "words that a person is unable to perform or lacks integrity in performing her or his employment duties" and "words that impute a person lacks ability or otherwise prejudices that person in her or his profession." *Dobias v. Oak Park & River Forest High Sch. Dist. 200*, 57 N.E.3d 551, 553 (Ill. App. Ct. 2016) (citation omitted). Plaintiff claims that these assertions were "demonstrably false" because "Syncreon has been in the industry for over 16 Years" and "performed on-time deliveries and received bonuses from Ericsson for doing so." (*See* Doil Tr. 44:12, 98:21-24.)

Defendant responds, arguing that Plaintiff has made no attempt to establish malice and that the statements alleged to be defamatory per se are statements of opinion and are not actionable. In addition, the so-called "best and brightest" comment was from an internal memo concerning negotiation strategy to be employed with Ericsson and thus was not published to any third party. *See Stone v. Paddock Publications, Inc.*, 961 N.E.2d 380, 391 (Ill. App. Ct. 2011) (reciting elements of defamation claim in Illinois).

The Court finds that the comments alleged to have been made to Ericsson are not actionable because they were statements of opinion. Also, the statements were made in the context of seeking a contract with Ericsson for which Plaintiff was a competitor. A party in such a situation would not be expected to go out of its way to speak kindly about its adversary. Presumably Ericsson, who had substantial experience with Plaintiff, would understand that, particularly since, as Plaintiff says, it obtained bonuses for its work under the contract, much of which was actually performed by Defendant pursuant to the subcontract. If a pitch for business that was proper under this Court's ruling, could still lead to defamation suits, the Court would be flooded with such cases.

The *Dobias* case is not similar. 57 N.E.3d 551. In that case, the Illinois Appellate Court found defamation per se where the defendants stated that the plaintiff, a high school assistant coach, was found in a hotel room bed with an athlete, had visited athletes late at night while they were drinking alcohol and using drugs, had hung out with them, and had taken them home without informing the school or their parents. *Id.* at 555, 567-68. In contrast, other statements to the effect that plaintiff drank alcohol, was verbally and physically aggressive, and had physically assaulted a coworker by grabbing his arm, were determined not to be defamatory per se. *Id.* at 571-72. The former were clearly statements of fact which were provably true or false. *Id.* at 567. The case of *Conseco Group Risk Management Co. v. Ahrens Financial Systems Inc.*, 2001 WL 219627 (N.D. Ill. March 6, 2001) is much closer to the point. There, while enmeshed in a commercial dispute, the defendant issued "critical updates" to the plaintiff's clients in which the defendant termed some of the plaintiff's actions as being "irrational," "very detrimental to your clients," "unusual" and putting clients "in a tough situation." *Id.* at *3. The court held that these statements were expressing opinion and were not defamatory per se. *Id.* at *9. Defendant's alleged statements

are clearly of this category.  The Motion for Summary Judgment on the claims for defamation per se and for violation of the Illinois Deceptive Practices Act are granted.

## VII. CONCLUSION

For the reasons stated herein, Defendant's Motions for Summary Judgment on each of the counts are granted.  Plaintiff's Motion for Summary Judgment on Count I is denied.

**IT IS SO ORDERED.**

                                                     Harry D. Leinenweber, Judge
                                                     United States District Court

Dated:  6/14/2018